UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| SYLVESTER I. PAYNE, ) | |
| ) | |
| Plaintiff, ) | Case No. CV08-00753 AJW |
| ) | |
| v. ) | |
| ) | MEMORANDUM OF DECISION |
| MICHAEL J. ASTRUE, ) | |
| **Commissioner of the Social** ) | |
| **Security Administration,** ) | |
| ) | |
| Defendant. ) | |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for supplemental security income ("SSI") benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

The parties are familiar with the procedural facts, which are set forth in the joint stipulation. [See JS 2-3]. In a written hearing decision that constitutes the final decision of the Commissioner, an administrative law judge ("ALJ") found that plaintiff had severe impairments consisting of a history of head trauma and hypertension, but that he retained the residual functional capacity ("RFC") to perform medium work. The ALJ concluded that plaintiff was not disabled because his RFC did not preclude him from performing either his past relevant work or alternative work available in significant numbers in the national

economy. [See JS 2-3; Administrative Record ("AR") 27].

## Standard of Review

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Stout v. Comm'r Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision. Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

## Discussion

**Severity determination**

Plaintiff contends that the ALJ improperly found that plaintiff did not have a severe mental impairment.

At step two of the five-step sequential evaluation procedure, the Commissioner must determine whether the claimant has a severe, medically determinable impairment or combination of impairments. See Smolen v. Chater, 80 F.3d 1273, 1289-1290 (9th Cir. 1996) (citing Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987)). A medically determinable mental impairment is one that results "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques," and it "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908; see 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). A medically determinable impairment or combination of impairments may be found "not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2006) (quoting Smolen, 80 F.3d at 1290).

1    To assess severity, the ALJ must determine whether a claimant's impairment or combination of
2 impairments significantly limits his or her physical or mental ability to do "basic work activities." 20 C.F.R.
3 §§ 404.1521 (a), 416.921(a); see Webb, 433 F.3d at 686. Basic work activities are the "abilities and
4 aptitudes necessary to do most jobs," such as (1) physical functions like walking, standing, sitting, lifting,
5 pushing, pulling, reaching, carrying, and handling; (2) the capacity for seeing, hearing, speaking,
6 understanding, carrying out, and remembering simple instructions; (3) the use of judgment; and (4) the
7 ability to respond appropriately to supervision, co-workers, and usual work situations. 20 C.F.R. §§
8 404.1521(b), 416.921(b). The ALJ is required to consider the claimant's subjective symptoms in making
9 a severity determination, provided that the claimant "first establishes by objective medical evidence (i.e.,
10 signs and laboratory findings) that he or she has a medically determinable physical or mental impairment(s)
11 and that the impairment(s) could reasonably be expected to produce the alleged symptom(s)." SSR 96-3p,
12 at *3.
13    If the ALJ "is unable to determine clearly the effect of an impairment or combination of impairments
14 on the individual's ability to do basic work activities, the sequential evaluation should not end" at step two.
15 Webb, 433 F.3d at 687 (quoting SSR 85-28); see McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3rd
16 Cir. 2004)("The burden placed on an applicant at step two is not an exacting one. . . . Any doubt as to
17 whether this showing has been made is to be resolved in favor of the applicant.").
18    As the ALJ noted in his decision, treatment records from the Los Angeles County Department of
19 Mental Health indicate that plaintiff, who was then 44 years old, was brought to the West Central Mental
20 Health Clinic ("West Central MHC") by his parents in February 2005 for reported symptoms of hearing
21 voices and bells ringing, problems with anger, crying spells, and difficulty sleeping. [AR 25, 156-157]. The
22 "crisis contact" evaluation states that plaintiff is "very suspicious, even of family members." [AR 156].
23 Plaintiff lived with his mother and "is supported by family members." [AR 156]. Plaintiff was reported to
24 have been shot in the head in 1997, and the "[b]ullets were not removed because the particles were too close
25 to the brain." [AR 156]. The diagnoses were dementia secondary to head trauma with behavioral problems
26 and bipolar disorder with psychotic features. Plaintiff was prescribed Abilify, an antipsychotic, Topamax,
27 an anticonvulsant, and the antidepressants Trazadone and Lexapro. The examining physician assigned
28 plaintiff a Global Assessment of Function ("GAF") score of 40, denoting some impairment in reality testing

1    or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several
2    areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids
3    friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at
4    home, and is failing at school). See American Psychiatric Association, Diagnostic and Statistical Manual
5    of Mental Disorders Multiaxial Assessment 30, 34 (4th ed. 1994)(revised 2002).

      Plaintiff attended medication follow-up visits at West Central MHC through June 2005, when plaintiff's prognosis was described as "poor." [AR 148]. Plaintiff and his mother initially reported that he felt "calm" on medications, had less ringing in the ears, and was sleeping well. Subsequently, however, plaintiff reported that he had problems obtaining medication refills and had noticed an increase in mood swings, irritability, and sleep problems when he was off his medication. [AR 149-153].

      Additional treatment records from West Health MHC indicate that plaintiff continued to receive mental health treatment from that facility in 2005 and continuing into 2006 and 2007. He continued on his medication regimen and also attended therapy sessions. [AR 196-217]. In January 2007, Dr. Elizabeth Grigor completed a mental RFC questionnaire stating that plaintiff had been a patient of the West Central MHC since February 2005 and that she had been seeing him monthly since September 2006. [AR 212-217]. She stated that plaintiff carried a diagnosis of dementia due to head trauma and had a GAF score of 45, signifying serious symptoms, such as suicidal ideation or severe obsessional rituals, or any serious impairment in social, occupational, or school functioning, such as the absence of friends or the inability to keep a job. [AR 212]. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders Multiaxial Assessment 30, 34 (4th ed. 1994)(revised 2002). [AR 212]. Dr. Grigor opined that plaintiff was "unable to sustain work" for an indefinite period of time. [AR 212]. She said that his "major head trauma" exacerbated his "dementia and mental illness," and that his medications caused sleepiness, dry mouth, nausea, and dizziness. [AR 212]. She said that plaintiff was not a malingerer. She indicated that he experienced numerous signs and symptoms of mental illness, including, among others, anhedonia, blunt, flat, or inappropriate affect, easy distractability, emotional withdrawal or isolation, mood disturbance, and memory impairment. [AR 213-214]. Dr. Grigor opined that plaintiff had numerous "moderate" and "marked" limitations in work-related functional abilities. [AR 215-216]. She estimated that plaintiff was likely to be absent from work more than four days per month as a result of his impairments. [AR 216]. She

noted that plaintiff's mother was his primary caretaker and that he had a "current history of 1 or more years' inability to function outside a hughly [sic] supportive living arrangement with an indication of continued need for such an arrangement." [AR 217].

In his disability report and testimony, plaintiff stated that he continued to undergo treatment with his "psych doctor" at West Central MHC through the date of the hearing in May 2007. [AR 80-81, 273-275]. Plaintiff testified that he saw Dr. King because he was hearing "ringing and stuff," had "bad dreams," and did not "like being around people." [AR 274]. Plaintiff admitted that he had missed a few appointments because he "forgot." [AR 274]. He said that his mother helped him take his medications. [AR 274]. Plaintiff said that when he went to his psychiatrist, both he and his mother talked to the doctor. [AR 274-275]. Asked why his mother went with him to his appointments, plaintiff replied, "Cause I don't understand, I don't know. I don't understand. . . . [W]hen they ask me stuff I don't understand it sometimes, you know, a lot of times. . . . She explains it to me." [AR 275]. Plaintiff also testified that his son's mother was dead, that he had not known that she used drugs while pregnant, and that his son had to be detoxified from cocaine as an infant until his mother took the baby to the doctor. [AR 268 , 270]. He testified that his mother had custody of his son. [AR 268, 270].

In October 2005, plaintiff underwent a consultative psychological evaluation with Dr. Rosa Colonna at the Commissioner's request. Dr. Colonna took a history, administered psychological tests, and conducted a mental status examination. She did not review any treatment records. [AR 162-167]. Dr. Colonna described plaintiff as "generally non-cooperative with psychometric testing in a passive aggressive manner. He refuses two portions of the examination stating that he cannot do them. Most of his responses are 'I don't know' or 'I don't remember.'. . . His overall demeanor and presentation is inconsistent with his history and psychometric testing processes." [AR 162]. Plaintiff gave a history of a gunshot wound to the head in 1995, which resulted in bullets being permanently lodged in his head. Plaintiff described having auditory hallucinations and headaches. He said his medications were helpful. He reported living with his mother and eight-month old son, whose mother had died. Plaintiff said gave a history of placement in special education classes and reported having last worked about 13 years earlier, when he worked as a cook. [AR 163].

In addition to noting plaintiff's poor effort and "gross exaggeration" on mental status examination,

1  Dr. Colonna observed that plaintiff exhibited mild psychomotor slowing, "borderline to low average" intellectual functioning, mildly dysthymic mood, slightly constricted affect, no hallucinations or other "obvious psychotic indicators" at the time of the examination, mildly diminished immediate, intermediate, and remote memory, mildly diminished attention and concentration, poor fund of knowledge, and poor insight and judgment. [AR 164-166]. Plaintiff achieved a verbal IQ score of 61, a performance IQ score of 60, and a full scale IQ score of 58. [AR 165].

Dr. Colonna's "probable" diagnoses were "mood disorder not otherwise specified," "consider malingering per effort on psychometric testing which is inconsistent with overall activities of daily living and presentation, rule out borderline intellectual functioning," and "consider personality disorder not otherwise specified with dependent and narcissistic traits." [AR 166]. Dr. Colonna assessed plaintiff's "overall cognitive ability" in the borderline to low average range. [AR 166]. She opined that plaintiff would be able to understand, remember and carry out short, simplistic instructions without difficulty and make simplistic work-related decisions without special supervision. He had a "mild inability" to understand, remember, and carry out and make detailed instructions. He was "generally socially appropriate with the examiner" but "in the competitive job market, he presents with a mild inability to interact appropriately with supervisors, coworkers and peers. [AR 166]. Dr. Colonna concluded that although plaintiff's examination results did not reflect his "true ability," plaintiff "may have an underlying mood disturbance that would benefit from continuation of outpatient mental health treatment services and alleged psychotropic medication." [AR 167].

Dr. Dudley, a nonexamining state agency physician, completed a mental RFC assessment form and a psychiatric review technique form ("PRTF") in November 2005. [AR 176-195]. He reviewed plaintiff's mental health treatment records as well as Dr. Colonna's examination report from a month earlier. On the PRTF, Dr. Dudley could have indicated that plaintiff's impairment was not severe, but he did not check that box. Instead, he indicated that plaintiff had a severe impairment, necessitating an RFC assessment. [AR 180, 190]. See 20 C.F.R. 416.920a(d)(3)("If we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity."). Dr. Dudley indicated that due to the presence of one or more organic mental disorders, psychotic disorders, and affective disorders, plaintiff had a "moderate" restriction in activities of daily living, "moderate"

difficulties in maintaining social functioning, and "moderate" difficulties in maintaining concentration, persistence, or pace. The existence of "moderate" restrictions in those three functional areas signifies a severe mental impairment. Cf. 20 C.F.R. 416.920a(d)(i)(stating that a claimant with no restrictions or "mild" restrictions in those three functional areas generally will not be found to have a severe mental impairment). Dr. Dudley did not indicate a rating for episodes of decompensation. [AR 190]. Among other things, Dr. Dudley noted that during a September 2005 physical examination, the Commissioner's consultative internist noted a scar on plaintiff's head (which was described by Dr. Mark Borigini as "a well healed scar in the left scalp area above the ear. One can also feel the shotgun pellets underneath the scalp." [AR 159]). Dr. Dudley suggested that this "may account for a decrease in memory, as determined [by] West Central Mental Health that gives the claimant a diagnosis of dementia secondary to a gunshot wound to the head." [AR188].

On the mental RFC form, Dr. Dudley indicated that plaintiff was moderately limited in the ability to understand and remember detailed instructions and in the ability to maintain attention and concentration for extended periods, but not significantly limited in other work-related functional abilities. [AR 176-177]. Dr. Dudley indicated that plaintiff could perform "short and simple" tasks. [AR 178].

In analyzing plaintiff's treatment notes from West Central MHC, the ALJ selectively focused on portions of March 2005 and April 2005 progress notes indicating that plaintiff was doing better on medication, and on portions of progress notes from September 2006 and October 2006 indicating that plaintiff reported feeling "fine" and that he had gone to a "work source" to "try to get a job." [See AR 25]. Noting that plaintiff "[a]pparently . . . had been referred to a job work source by his mental health care," the ALJ concluded that this evidence "suggests that [plaintiff], although having a degree of functional limitations, would still be capable of managing some work activities." [AR 25]. What the ALJ did not mention is that plaintiff's social worker referred him to a "work source" only after plaintiff's SSI application had been denied, and there is no indication in the record that plaintiff further pursued or found work. The ALJ also cited Dr. Colonna's findings of poor effort and exaggerated responses. Citing these "inconsistencies in the record," the ALJ rejected Dr. Grigor's mental RFC assessment. [AR 25].

The severity inquiry is "a de minimis screening device to dispose of groundless claims." Edlund v. Massanari, 253 F.3d 1152, 1158 (9th Cir. 2001) (quoting Smolen, 80 F.3d at 1290). "[A]n ALJ may find

that a claimant lacks a medically severe impairment or combination of impairments *only when his conclusion is 'clearly established by medical evidence.'*" Webb, 433 F.3d at 687 (emphasis added)(quoting Smolen, 80 F.3d at 1290, and SSR 85-28). The medical evidence does not "clearly establish" that plaintiff's mental impairment was no more than a "slight abnormality" having a "minimal effect" on his ability to work. Webb, 433 F.3d at 686. In finding that plaintiff's mental impairment was not severe, the ALJ "appears to have applied a more stringent legal standard than is warranted by law" by "selectively focus[ing] on aspects of" the examining psychologist's report that "tend[ed] to suggest non-disability" and disregarding the treating and nonexamining physicians' contrary findings and opinions. Edlund, 253 F.3d at 1158-1159 (holding that even though an examining psychologist expressed doubts about the reliability of the claimant's test score and was concerned that the claimant was abusing his prescribed medication and may even have been under the influence during the examination, the ALJ erred by selectively focusing on those aspects of her opinion and ignoring her conclusion that the claimant nonetheless had a severe mental impairment).

For all of these reasons, the ALJ's finding that plaintiff did not have a severe, medically determinable mental impairment, alone or in combination with his physical impairments, is not based on substantial evidence in the record and reflects application of an improper legal standard.

**Choice of remedy**

In general, the choice whether to reverse and remand for further administrative proceedings, or to reverse and simply award benefits, is within the discretion of the court. See Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.) (holding that the district court's decision whether to remand for further proceedings or for payment of benefits is discretionary and is subject to review for abuse of discretion), cert. denied, 531 U.S. 1038 (2000). The Ninth Circuit has observed that "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir. 2004) (quoting INS v. Ventura, 537 U.S. 12, 16 (2002) (per curiam)). A district court, however,

> should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

1  Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (citing Harman, 211 F.3d at 1178). The Harman test
2  "does not obscure the more general rule that the decision whether to remand for further proceedings turns
3  upon the likely utility of such proceedings." Harman, 211 F.3d at 1179; see Benecke, 379 F.3d at 593
4  (noting that a remand for further administrative proceedings is appropriate "if enhancement of the record
5  would be useful").

6      There are outstanding issues because the ALJ did not reach the remaining steps in the sequential
7  evaluation procedure. Accordingly, the appropriate remedy is a remand for further administrative
8  proceedings and a new hearing decision. See Webb, 433 F.3d at 688 (remanding for further administrative
9  proceedings where "the ALJ should have continued the sequential analysis beyond step two because there
10 was not substantial evidence to show that [the disability] claim was 'groundless'").

### Conclusion

12     For the reasons stated above, the Commissioner's decision is **reversed,** and this case is **remanded**
13 **for further administrative proceedings** consistent with this memorandum of decision.

15 DATED: January 6, 2009

_____
ANDREW J. WISTRICH
United States Magistrate Judge